IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2024

**IN RE LEAH T.**

**Appeal from the Chancery Court for Rutherford County**
**No. 20CV-1606       J. Mark Rogers, Judge**

_____

**No. M2023-01338-COA-R3-PT**

_____

In the second appeal in this case, Mother appeals the trial court's determination that termination of her parental rights is in her child's best interest. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN, JJ., joined.

Daniel L. Graves, II, Murfreesboro, Tennessee, for the appellant, Ziqurra R.

Marjorie A. Bristol, Goodlettsville, Tennessee, for the appellees, Gwendolyn and Robert D.

**OPINION**

**I. FACTUAL AND PROCEDURAL HISTORY**

In August 2015, the child at issue, Leah T., born in March 2015, was seriously injured in a domestic violence attack on Respondent/Appellant Ziqurra R. ("Mother") by her then-boyfriend ("Ex-Boyfriend").[1] Mother was holding the child when the attack occurred. Mother fell, and the child suffered a traumatic brain injury as a result. Mother thereafter executed an Immediate Placement Agreement placing the child with Petitioner/Appellee Gwendolyn D. ("Foster Mother").[2] The Davidson County Juvenile

_____

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.
[2] Foster Mother is the child's paternal grandmother's sister.

Court ("the juvenile court") thereafter granted Foster Mother permanent guardianship of the child.

On September 22, 2020, Foster Mother and her husband Petitioner/Appellee Robert D. (together with Foster Mother, "Petitioners") filed a petition in the Rutherford County Chancery Court ("the trial court") to terminate Mother's parental rights to the child, alleging as grounds abandonment through failure to visit and support, persistence of conditions, and failure to manifest an ability and willingness to parent.[3] In May 2021, the trial court permitted Petitioners to amend their complaint to add the severe abuse of both Leah and her sibling and Mother's alleged mental incompetence to parent as additional grounds.

A trial occurred in May 2022. The testimony generally focused on the consequences of the child's injury and current circumstances, Mother's drug use, her mental health treatment, and visitation. The proof shows that Mother voluntarily placed the child with Petitioners after she suffered a traumatic brain injury during a domestic violence incident. This was not the first time that Ex-Boyfriend was violent with Mother. The child's injury caused bleeding in her brain and seizures. Medication controls the seizures, but the child is "delayed," has been diagnosed with autism, and requires occupational therapy and an individualized education plan. Due to her autism in particular, the child needs consistency and does not handle change well.

The proof showed that when Mother gave birth to her second child, Amaria, in 2017,[4] the umbilical cord blood tested positive for cocaine. Amaria suffered from respiratory distress and other medical issues immediately following her birth, possibly as a result of the drug exposure. Mother denied using cocaine at any time after her pregnancy with Leah and testified that she stopped using THC once she found out about her pregnancy with Amaria. But Mother testified that she was informed that she also tested positive for cocaine and THC following the birth of Amaria. Later, Mother also admitted that she tested positive for drugs two or three times during her prenatal care with Amaria. Mother claimed that she was told by Ex-Boyfriend that THC use was safe during pregnancy.

The Tennessee Department of Children's Services ("DCS") removed Amaria from Mother's custody due to the drug exposure, with the child transferring directly into DCS custody from the hospital where she was born and treated after birth. Mother's permanency plan for Amaria included tasks, such as domestic violence classes, parenting classes, and a drug and alcohol assessment. Although Mother had completed a psychological evaluation and a parenting assessment,[5] she had not taken the recommended classes or the alcohol and

---

[3] The petition also sought to terminate the parental rights of the child's biological father, Ex-Boyfriend. The trial court terminated his parental rights, and he did not appeal.

[4] Ex-Boyfriend is also the father of Mother's younger child.

[5] Some of these efforts appear to have occurred prior to the birth of Amaria, even though Leah was never placed in DCS custody.

drug assessment. At the time of trial, Amaria remained in DCS custody, but her current DCS case manager had been unable to get into contact with Mother, despite her efforts.

Mother's testimony and mental health records introduced at trial indicated that she has been diagnosed with bipolar I disorder. It was recommended that Mother participate in outpatient therapy twice a month and take medication to treat her disorder. However, both Mother's testimony and the records indicated that Mother declined to take medication. Mother testified that she did attend mental health counseling; however, her medical records showed that there were sometimes "gaps in service" and identified as barriers to her success "the infrequency of appointments." A later note, however, suggested that there were no present barriers to success. Mother further testified that she no longer had contact with Ex-Boyfriend, which has helped her improve.

The child has remained with Petitioners continuously since August 2015. Mother was permitted weekly supervised visitation. Mother visited with the child fairly regularly between 2015 and 2018. In 2016 or 2017, Mother filed a petition in the juvenile court for a return of the child to her.[6] Mother was appointed counsel in juvenile court proceedings, but the petition was ultimately denied.

Mother's last in-person visit with the child occurred in June 2018. According to Mother, she stopped asking for visitation after Petitioners denied visitation and there was conflict between Mother and Petitioners. Foster Mother denied ever disallowing visitation except for one instance when Petitioners and the child were out-of-town. Foster Mother testified that Mother simply never requested a visit again after June 2018. Foster Mother also testified that there had been no contact with Mother after the last visit, other than when she left a voicemail for Foster Mother in 2022.[7] Even before Mother fully stopped communicating with Petitioners, Foster Mother testified that Mother never asked about the child's special needs. According to Foster Mother, the child suffered night terrors after visits with Mother, but the night terrors stopped when Mother stopped visiting.

As a result of Mother's lack of contact, the child does not know Mother and has no relationship with her. In contrast, the child calls Petitioners "Mom" and "Dad" and views them as her parents. The child is also bonded with Petitioners' family and regularly visits with Amaria. Foster Mother expected that visitation to continue even if termination was granted. Petitioners plan to adopt the child if termination of Mother's parental rights is granted.

Following the conclusion of the proof, the trial court ruled that clear and convincing evidence supported only three grounds for termination: abandonment through failure to visit, abandonment through failure to support, and severe abuse of the child's sibling. The

---

[6] Mother was pregnant with her second child during this time.
[7] Mother claimed that other calls took place sporadically until "Thanksgiving last year."

trial court further found that, in reliance on the best interest factors effective at the time the initial petition was filed, termination was in the child's best interests. Mother thereafter appealed to this Court.

In our first Opinion, we affirmed the trial court's rulings as to the statutory grounds of abandonment through failure to support, abandonment through failure to visit, and severe abuse of the child's sibling. ***In re Leah T. ("Leah I")***, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *1 (Tenn. Ct. App. June 22, 2023). Specifically, we affirmed the trial court's finding that Mother was not denied visitation by Petitioners and that her failure to visit was therefore willful. ***Id.*** at *9. We also held that Mother's decision to use illegal drugs during her pregnancy with Amaria constituted severe child abuse. ***Id.*** at *11–12. We vacated, however, the trial court's best interest findings and remanded for reconsideration under the amended best interest factors in effect at the time the amended petition was filed. ***Id.*** at *13–14.

Following the remand, on August 31, 2023, the trial court entered a detailed order considering the amended best interest factors and again concluded that termination was in the child's best interest. From this order, Mother again appeals.

## II. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." ***In re Carrington H.***, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." ***Id.*** at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." ***Id.*** at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See **In re Valentine***, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." ***In re Addalyne S.***, 556 S.W.3d 774, 782

(Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court recently explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

### III. ANALYSIS

The sole issue in this appeal is whether the trial court erred in concluding that the child's best interests were served by terminating Mother's parental rights. At the time the

amended petition was filed in this matter, the factors that courts were directed to consider in ascertaining the best interests of children included, but were not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;
(O) Whether the parent has ever provided safe and stable care for the child or any other child;
(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;
(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;
(R) Whether the physical environment of the parent's home is healthy and safe for the child;
(S) Whether the parent has consistently provided more than token financial support for the child; and
(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1).

We look first to those factors related to the child's attachments. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachment), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's relationships with others). The trial court found each of these factors to favor termination of Mother's parental rights, citing the lack of relationship between Mother and the child, as well as the strong relationship that the child now has with Petitioners. After our review of the record, we agree.

Here, the proof shows that the child was removed from Mother's custody when she was less than five months old. The child was placed with Petitioners, where she has remained ever since, a period of approximately seven years. Although Mother initially participated in visitation, Mother stopped visiting altogether in June 2018, and generally made no contact with Petitioners until a single voicemail sent well after the termination petition was filed. While Mother placed the blame for the lack of visits on Petitioners' interference, the trial court did not credit that explanation and this Court affirmed that Mother's failure to visit was willful in *Leah I*. 2023 WL 4131460, at *9.[8] As a result of

---

[8] Mother's attempt to re-litigate whether her lack of visitation was due to Petitioners' conduct therefore lacks merit. *See, e.g*, *Memphis Pub. Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (explaining that the law of the case doctrine "generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case").

Mother's failure to visit, Mother and the child have no relationship whatsoever. Indeed, Foster Mother testified that following visits with Mother, the child suffered from night terrors; the night terrors stopped when Mother stopped visiting. As a result, Mother's conclusory assertion on appeal that Mother will be "a great benefit" to the child rings especially hollow.

On the other hand, the child maintains meaningful relationships with Petitioners, who the child views as her mom and dad, Petitioners' adult children and their children, their extended family, and the child's younger sibling, who is also not in Mother's custody. Moreover, the testimony indicated that due to the child's autism, the child does not respond well to transitions and needs consistency to thrive. As a result, these factors strongly favor termination.

We next consider whether Mother can meet the child's needs. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (O) (involving the parent's prior provision of safe and stable care to any child), (P) (involving the parent's understanding of the child's basic needs), (Q) (involving the parent's commitment to having a home that meets the child's needs), (S) (involving the parent's consistent payment of more than token child support). Again, the trial court found each of these factors, save one, to favor termination, given that Mother paid no child support for the child for large periods of time and had not maintained care for any of her children. With regard to one factor, (Q), however, the trial court ruled that it was inapplicable, citing on the one hand that Mother had stable housing, but on the other that Mother did not appear prepared to deal with the child's special needs.[9] On the whole, the evidence does not preponderate against the trial court's findings as to these factors.

As the trial court correctly found, Mother has not provided consistent care for either of her two children, as they were both removed from her care when they were infants. While in Mother's care, this child was exposed to significant domestic violence,[10] and the younger child was exposed to drugs in utero. Mother also does not appear to have a real understanding of the child's special needs, as Foster Mother testified that Mother never inquired about the medical or educational needs of the child, which are not insignificant.[11] Finally, the proof showed that Mother had not paid child support for the child consistently, as she only made child support payments in three months in 2019, none in 2020, and three months in 2021. So then factors (O), (P), and (S) generally favor termination of Mother's parental rights.

---

[9] Rather than inapplicable, it appears more apt to characterize this factor as neutral.
[10] Following the child's serious injuries due to Ex-Boyfriend's violence, Mother chose to continue her relationship with him such that another child resulted from the union.
[11] Mother admitted that her driver's license is currently suspended. As a result, to the extent that the child has medical appointments or occupational therapy outside of school, Mother's lack of transportation could become an issue.

The trial court further found that the abuse that Mother perpetrated against the child's sibling weighed in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(N) (involving any abuse or neglect present in the parent's home).

Some factors, the trial court found, did not favor termination.[12] For example, the trial court found that there was no proof that the child was fearful of living in Mother's home *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home). The trial court also found that there was no proof that contact with Mother would trigger the child's experience of trauma. *See* Tenn. Code Ann. § 36-1-113(i)(G) (involving whether the child's trauma is triggered by being in the parent's home). Although we note the testimony that the child experienced night terrors after visitation with Mother that stopped when visitation ended, Petitioners concur in the findings by the trial court as to these factors. We therefore conclude that the trial court correctly declined to weigh these factors in favor of termination.

The trial court further found that the factors concerning Mother's urgency, efforts to change her circumstances, and mental health were either inapplicable or did not favor termination. *See* Tenn. Code Ann. § 36-1-113(i)(J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (M) (involving the parent's sense of urgency), (R) (involving the health and safety of the home), (T) (involving the effect of the parent's mental and emotional fitness on the child). In making these findings, the trial court noted the fact that Mother had obtained stable housing and was participating in mental health treatment. Petitioners do not dispute the trial court's findings with regard to factors (R) or (T), so we agree that these factors do not weigh in favor of termination.

Petitioners strongly dispute, however, the trial court's findings under factors (J), (K), and (M). For her part, Mother asserts that the trial court correctly concluded that she had made a lasting adjustment of circumstances but erred in failing to give these factors more weight.

With regard to factor (J), the trial court found that "Mother testified she has been in counseling for years to address her bipolar disorder and has had no contact with [Ex-Boyfriend] in some time." The trial court also referenced findings in its prior order, to wit:

[Mother] testified that she is no longer in contact with [Ex-Boyfriend], which

---

[12] As to many of these factors, the trial court found that due to a lack of proof, the factor was inapplicable. However, a lack of proof as to an issue most often means that the factor does not favor termination. *See*, *e.g.*, **In re Cartier H.**, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at \*14 (Tenn. Ct. App. Oct. 31, 2023) (explaining that the "failure to submit sufficient proof as to a factor does not necessarily mean that the factor is inapplicable"). Regardless of how these factors are characterized, the trial court did not find that they favor termination.

she states has improved her mental health and greatly lessens her use of drugs. This shows to the Court an attempt at an adjustment of circumstances to make the home safer. . . . [Mother] testified that she has consistently attended counseling for years to manage her bipolar disorder. These efforts in [Mother's] mental health in conjunction with her decision to remove [Ex-Boyfriend] from her life indicate to the Court that [Mother] has attempted to make lasting adjustments. This Court finds that [Mother] has made efforts to improve her situation[.]

The trial court made similar findings with regard to factor (K):

Consistent with the previous factor, the Court finds this factor slightly favors the Mother and goes against terminating her parental rights. According to Mother's testimony, she has taken advantage of counseling services in the community for years. While this is perhaps only one example, there was no other proof as to this factor.

On appeal, Petitioners assert that the proof preponderates against these findings and that these factors, in fact, weigh in favor of termination. In particular, Petitioners point out that Mother was not following her recommended mental health treatment plan because she was not taking medication. Moreover, Petitioners assert that there can be no finding that Mother's care would be safe or beneficial for the child because she has not taken any pains to contact the child in years. Petitioners note that the trial court found that Mother was not completing the steps required of her permanency plan in the DCS case involving her younger child. Finally, Petitioners contend that Mother has not demonstrated that she can financially support the child.

Although these factors are somewhat of a close call, we cannot conclude that the evidence preponderates against the trial court's findings. Here, Mother testified that she was participating in mental health treatment. While Mother admitted that she did not take recommended medication for her mental health disorders, her mental health records reflect that she informed her providers of her choice and while they continued to recommend medication, they acquiesced to some extent in Mother's choice. Moreover, there was no proof that the lack of medication prevented Mother from living her day-to-day life or parenting a child. So then, it does not appear that the trial court erred in crediting Mother's testimony that her mental health issues were properly treated and not a barrier to her ability to parent.

Mother also testified that she had not used drugs in several years and that she had no contact with Ex-Boyfriend for a similar period of time. But the proof showed that, in the DCS case involving Mother's younger child, she was asked to complete parenting classes, domestic violence classes, and an alcohol and drug assessment; Mother's DCS

case manager testified that Mother has completed none of those offerings.[13] Still, while participating in these services would surely be beneficial to Mother, there was simply no proof that either drugs or domestic violence had been an issue in Mother's home for several years by the time of trial and nothing in the trial court's order indicates that it believed that a relapse of these issues was in any way likely. Finally, while it is true that Mother has not contacted the child or paid consistent support, the trial court clearly considered these facts thoroughly with regard to other best interest factors. As a result, we cannot conclude that the evidence preponderates against the trial court's findings as to these two factors. However, given the fairly evenly matched proof on these factors, we also cannot conclude that the trial court erred in failing to give these factors more weight in Mother's favor in its ultimate decision.

Finally, Petitioners assert that the trial court erred in finding factor (M), involving Mother's urgency, to weigh in her favor. Specifically, the trial court found as follows:

> As to this factor, the Court finds there is proof to support Mother demonstrating a sense of urgency in regaining custody of the minor child as she testified she did make an attempt to regain custody with the Davidson County Juvenile Court between 2015 and 2017, but was unsuccessful. Mother's testimony was this was her only attempt. As to addressing the circumstances, conduct, or conditions that made an award of custody to the Mother unsafe, she testified she has been in counseling for years and has had no contact with [Ex-Boyfriend], her domestic violence abuser. Based on all of the above considerations, the Court finds this factor favors the Mother and goes against terminating her parental rights.

Petitioners admit that Mother testified that she attempted once, while she was pregnant with the younger child, in either 2016 or 2017, to regain custody of the child at issue by filing a petition in the juvenile court. But Petitioners point out that at that time, Mother was not fit to parent the child because she was found to have used illegal drugs while pregnant with the younger child.

We agree with Petitioners as to this factor. At the time that Mother filed her petition, Mother was pregnant with another child. During this time, however, Mother continued to test positive for illegal drugs, and admitted to THC use. Moreover, despite the appointment of counsel to help her prosecute her petition, Mother was not successful in her bid for custody. As such, it appears that at that time, Mother had not made adjustments to her life that the juvenile court believed made it safe for Leah to be returned to her. And after this

---

[13] Mother did complete multiple parenting assessments and a psychological assessment, some of which appears to have occurred before the birth of Amaria. The technical record also includes some certificates from classes that Mother attended in 2016, 2017, and 2018. However, no proof of those classes was offered at trial.

single bid for custody, Mother's contact with the child would eventually deteriorate to nothing. So we conclude that this factor favors termination.

Thus, twelve factors weigh in favor of termination, while eight factors either weigh against termination, are neutral, or are inapplicable.[14] Determining a child's best interest, however, does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). In this case, in Mother's favor is that she does appear to have made positive adjustments in her life in recent years that could potentially make her better able to parent the child. But the evidence also shows that for the last approximately seven years, the child has been placed in a loving stable home where all of her needs are met. The proof further shows that the child is bonded to this family and that her autism means that she responds particularly poorly to changed circumstances. Moreover, the simple fact is that because Mother willfully failed to visit with the child after June 2018, Mother is nothing more than a stranger to this child.

"Once a parent has been found to be unfit, the interests of the parent and the child diverge. While the parent's interests do not evaporate upon a finding of unfitness, the focus of the proceedings shifts to the best interests of the child." *White*, 171 S.W.3d at 193. "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *Id.* at 194. Here, despite Mother's progress, the child's best interests are best served by maintaining her in the only home and family that she has ever known. As such, we affirm the trial court's finding that termination of Mother's parental rights is in the child's best interest.

## IV. CONCLUSION

The judgment of the Rutherford County Chancery Court is affirmed, and this cause is remanded for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Ziqurra R., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[14] The trial court also found factor (L), involving "[w]hether [DCS] has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of [DCS,]" to favor Petitioners. Petitioners concede in their brief that this factor is inapplicable because the child was not "in the custody of [DCS]." We agree that this factor is inapplicable.